IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **GEORGE STYLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-cv-106-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff George Styles, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Mr. Styles applied for benefits in October 2011, alleging disability beginning on July 14, 2011.  (Tr. 11).  After holding an evidentiary hearing, ALJ Patricia Witkowski Supergan denied the application on October 30, 2013.  (Tr. 11-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 12.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.   The ALJ erred in assigning no weight to the opinion of Physician's Assistant Micah Oakley.

2.   The ALJ failed to give good reasons for her assessment of plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination

of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work

experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step

three.   If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Styles was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility,

or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Supergan followed the five-step analytical framework described above. She determined that Mr. Styles had not been engaged in substantial gainful activity since the alleged onset date and that he was insured for DIB through December 31, 2014.   She found that plaintiff had severe impairments of degenerative joint disease and degenerative disc disease.   The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Styles had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the regional and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

1.     **Agency Forms**

Plaintiff was born in 1964 and was 47 years old on the alleged date of onset. (Tr. 174).   He was 5'8" tall and weighed 175 pounds.   He said he was unable to work because of a herniated disc and "massive degeneration" in his low back and a back injury.   (Tr. 177).

Plaintiff received a GED in 1992.   (Tr. 177).   He had worked as a maintenance man, a carpenter, and a security guard.   (Tr. 192).

In a Function Report submitted in November 2011, Mr. Styles said that he could not stand or sit for a long time, could not pick up or carry anything of weight, and could not bend or squat.   He said that he fed and watered his chickens, did some housework and some cooking.   He attended his son's ball games, but could not sit long and always had to be up and down.   He had hobbies of fishing, hiking and gardening, but could no longer hike as he could not walk one-fourth of a mile, and could not garden, pull weeds, hoe, or get down to harvest.   He used a walking stick while walking in the yard.   (Tr. 200-208).

### 2.    Evidentiary Hearing

Mr. Styles was represented by an attorney at the evidentiary hearing on October 10, 2013.   (Tr. 28).

Plaintiff testified that he hurt his back a week before the alleged onset of disability.   He was lifting a heavy sprayer off his truck, and something snapped in his back and leg.   (Tr. 32).   Mr. Styles had not done any farming after that incident.   He lived in a ranch house on 19 acres of land with his wife and 16 year old son.   He had a small vegetable garden, but family members did the planting.

They had about 14 free-range chickens.   Plaintiff sometimes collected the eggs. He did some light housework.   His son cut the grass.   (Tr. 33-34).

Mr. Styles' wife owns a laundromat.   She had a contract for deed arrangement.   Plaintiff signed the contract along with his wife.   (Tr. 44).   It is about 24 miles from their house.   Sometimes, plaintiff watches the laundromat for his wife.   He goes and sits there or walks around and helps people get soap or dryer sheets.   He testified that he did not lift anything there.   Four times a week, his daughter drops her 2 and a half year old daughter there, and plaintiff picks her up and babysits her.   (Tr. 35-37).

Plaintiff testified that he had pain in his left shoulder and neck.   He said he could "barely" use his left arm at all and that he had lost "all the muscle tone in it." He said that he had constant pain in his neck, and daily headaches.   He also had some pain in his low back and hip, but it had gotten better since he hurt his back in 2011.   He had not used a cane recently because he had not walked long distances. Walking around Wal-Mart caused him pain in his hips and running down his leg. When he is at home, he lays down three or four times a day.   (Tr. 40-43).

At the time of the hearing, plaintiff was taking only ibuprofen, Aleve or Tylenol.   He had taken Hydrocodone and Flexeril in the past, but stopped because he had stomach problems.   (Tr. 41-42).

A vocational expert (VE) also testified.   The ALJ asked her a series of hypothetical questions.   The first one corresponded to the ultimate RFC findings, that is, a person of plaintiff's age and educational background who could do light

work, limited to occasional climbing of ramps and stairs and no climbing of ladders, ropes or scaffolds.   He could occasionally balance, stoop, kneel, crouch and crawl, frequently reach in all directions, occasionally reach overhead, frequently handle and finger, and constantly feel with both upper extremities.   He could tolerate occasional exposure to extreme cold, wetness, humidity and hazards such as moving machinery and unprotected heights.   The VE testified that this person could not do plaintiff's past relevant work, but he could do other jobs such as lamp tester, bench assembler and sorter.   (Tr. 46-48).

**4.    Medical Records**

Mr. Styles went to the emergency room on July 14, 2011, complaining of back pain.   X-rays showed moderate to severe degenerative facet and disc disease in the lumbar spine.   (Tr. 264-267).

Plaintiff was seen at Logan Primary Care for back pain on July 21, 2011.   On exam, there was tenderness over the lumbosacral musculature radiating to the medial gluteal muscle.   Straight leg raising was negative.   The assessment was acute back pain.   An MRI was recommended.   (Tr. 283-284).

A lumbosacral MRI was done on July 28, 2011.   Plaintiff has four classic lumbar vertebrae, and a transitional T-12 vertebra.   This study showed minimal disc bulge at L1-2, small disc bulge at L2-3 and L3-4, and large disc bulge at L4-S1, along with multi-level central canal stenosis and foraminal stenosis.   (Tr. 307-308).

Plaintiff returned to Logan Primary Care on August 10, 2011, complaining of

back pain radiating down his posterior right thigh.   Straight leg raising was positive on the right.   He was referred to a neurosurgeon.   (Tr. 280-282).

Mr. Styles was seen at Trinity Neuroscience Institute two times in November 2011.   On the second visit, Dr. Taveau noted that he had degenerative disc disease and a large L5-S1 herniation.   His gait was non-antalgic and he was able to heel-and-toe-walk.   He had no muscle spasm and no tenderness in the paraspinous area.   Straight leg raising was negative.   He had no sensory loss or motor weakness.   The doctor discussed surgery with him, and plaintiff said he did not wish to proceed with surgery.   He was referred to an orthopedist for hamstring symptoms.   (Tr. 315-320).

Dr. Michael Davis, an orthopedic specialist, saw plaintiff on four visits between November 23, 2011, and April 9, 2012.   He diagnosed a grade 2 hamstring tear on the right.   Dr. Davis gave him a steroid injection and prescribed physical therapy.   The doctor did not recommend surgery for his hamstring, and referred him back to Trinity Neuroscience for his back pain.   (Tr. 338-342).

Plaintiff continued to be seen at Logan Primary Care.   In December 2011, he had no vertebral tenderness to palpation, but he was tender over the lumbosacral musculature.   His gait was normal.   He had tenderness in the right thigh that radiated to the posterior knee.   He was prescribed Flexeril.   (Tr. 361-361). Plaintiff returned in March 2012, complaining of worse back pain.   On exam, he had tenderness in the right lumbar paraspinal musculature in to the buttock, and straight leg raising was positive on the right.   A cane was prescribed.   (Tr.

Page **9** of **22**

356-357).   In April 2012, he again had tenderness over the lumbosacral spinal musculature, but straight leg raising was negative.   Strength was 4/5 in the right leg.   He was using a cane.   (Tr. 350-352).

Mr. Styles was seen in the Family Health Care Clinic at Franklin Hospital on May 9, 2012, for a rash on his arms, possibly poison ivy, after having been in the woods with his son.   (Tr. 417-418).

In July 2012, plaintiff was seen by APN Jill Cash at Logan Primary Care. Among other things, he complained of left shoulder pain for two months.   He had decreased range of motion of the left arm/shoulder reaching behind his back and head.   (Tr. 533-534).   X-rays of the left shoulder showed moderate osteoarthritis of the acromioclavicular joint.   (Tr. 530).

Mr. Styles was seen again at Logan Primary Care on July 26, 2012, by PA Micah Oakley.   This was his first visit with PA Oakley.[3]   Plaintiff said that he had pain radiating from his left shoulder into his neck and he was getting headaches. He wanted a form filled out for "disability."   The exam notes are brief.   Under "musculoskeletal," PA Oakley noted that he walked with a cane and had pain with range of motion loss.   He also noted that he had filled out the disability form with the patient present.   (Tr. 531-532).

An MRI of plaintiff's left shoulder was done on July 31, 2012.   This study

---

[3] Plaintiff's brief states that Mr. Styles "established care" with PA Oakley on July 11, 2012.   See, Doc. 14, pp. 3-4.   However, the medical records indicate that Mr. Styles was seen by APN Jill Cash on that date.   The office note was co-signed by Jeffrey Parks, M.D.   There is no indication that PA Oakley saw Mr. Styles on July 11, 2012.   See, Tr. 533-534.

showed marked rotator cuff tendinosis with tears, glenohumeral joint osteoarthrosis, marked hypertrophic degenerative changes of the glenohumeral joint, and joint effusion.   (Tr. 526-527).

An MRI of the cervical spine done on August 6, 2012, showed disc bulges at multiple levels with some spinal canal stenosis and foraminal narrowing.   (Tr. 524-525).

Brett Miller, M.D., an orthopedist, saw plaintiff for neck pain radiating into his left shoulder on August 27, 2012.   He noted limited range of motion of the neck, but good range of motion of the left shoulder.   There was no muscle atrophy in the left arm.   He diagnosed cervical spine radiculopathy and a partial thickness or possible full thickness rotator cuff tear.   He recommended that plaintiff have his neck taken care of before he considered surgical intervention on his shoulder.   (Tr. 404-405).

PA Oakley saw plaintiff on August 31, 2012.   On exam, he noted that plaintiff had a full range of motion of the spine and extremities, his strength was full throughout, and he had good muscle tone with no muscle atrophy.   He added Neurontin to the medications that plaintiff was already taking.   (Tr. 522-523).

Plaintiff saw Dr. Jones at Trinity Neuroscience on September 26, 2012.   On exam, he had no sensory loss and no motor weakness.   Balance and gait were intact.   Fine motor skills were normal.   He was neurologically intact.   He had "severe pain" with cervical range of motion.   Dr. Jones noted that he had degenerative disc disease from C2 to T2 and stenosis worse from C3 to C6.

However, there was no indication for surgery.   (Tr. 481-483).

On October 1, 2012, plaintiff told PA Oakley that his neck and shoulder pain was not any better.  On exam, he again noted that plaintiff had a full range of motion of the spine and extremities, his strength was full throughout, and he had good muscle tone with no muscle atrophy.   The dosage of Neurontin was increased.  (Tr. 521-522).

Mr. Styles then returned to Dr. Miller in November, 2012, for his left shoulder.  Dr. Miller observed that he was "not terribly tender about that left shoulder."  He had weakness with abduction and external rotation, but no instability and range of motion was "fine."  The impression was cervical radiculopathy with secondary left shoulder problems; no frank full-thickness rotator cuff tear was identified.  Plaintiff told Dr. Miller that he was doing "fairly well" on pain medication and Flexeril prescribed by his family doctor.  The doctor prescribed some physical therapy and told him to return as needed.  (Tr. 401-402).

Mr. Styles was seen at Logan Primary Care several times in October and November 2012 for abdominal pain.  (Tr. 508-519).  He then cancelled two appointments in January 2013.  (Tr. 506-507).

Plaintiff saw PA Oakley on February 7, 2013.  He reported that he thought his abdominal pain was caused by his medications, so he had stopped taking them. He said he had not taken Vicodin for a month.  On exam, his abdomen was soft and nontender.  His neck was supple.  There was no cyanosis, clubbing or edema

of the extremities.   PA Oakley did not note any restriction of range of motion, muscle spasm or muscle atrophy.   He prescribed Zantac, Vicodin, and Flexeril, along with Metformin (oral medication used to treat diabetes) and Lipitor.   PA Oakley also noted that they would need "ameritox and narc contract."[4]   (Tr. 503-505).

A urine sample was collected on February 7, 2013, and the Ameritox report was issued on February 12, 2013.   Mr. Styles tested positive for hydrocodone with acetaminophen, i.e., Vicodin, and marihuana metabolites.   A handwritten note on the report, dated February 14, 2013, states that he "failed" and "send letter."   (Tr. 543-546).   The records do not contain a copy of a letter to plaintiff about the test results.   Plaintiff cancelled an appointment with PA Oakley on March 7, 2013. (Tr. 502).

Mr. Styles went to the Family Healthcare Clinic at Franklin Hospital on March 12, 2013.   He stated that he had suffered from abdominal pain for some time and he wanted to know if it was caused by Lopid, a cholesterol-lowering medicine that had been prescribed by PA Oakley.   Plaintiff was wearing a neck support.   Physical exam was normal.   He was advised to consult with "Dr. Oakley" regarding Lopid.

There is no indication that Mr. Styles returned to PA Oakley or Logan Primary Care for further treatment.

---

[4] Ameritox is a company which provides "urine drug testing services to help physicians assess medication adherence of patients on chronic opioid therapy."   http://www.ameritox.com, visited on January 6, 2016.

**5.    PA Oakley's Opinion**

On July 26, 2012, PA Oakley completed a form entitled "Medical Source Statement of Ability To Do Work-Related Activities (Physical)."   According to the office note that same date, plaintiff brought this form in to the office to be filled out, and PA Oakley filled out the form in plaintiff's presence.   See, Tr. 531-532.

PA Oakley indicated that plaintiff could occasionally lift less than 10 pounds, but he was unable to frequently lift any amount of weight.   He could stand or walk less than 2 hours total in a work day and had to use a cane to walk.   He could not sit for more than 15 minutes without substantial pain.   He could never do postural activities such as balancing or kneeling.   He could only occasionally reach, handle, finger and feel.   (Tr. 390-393).

## Analysis

Plaintiff first argues that the ALJ erred in analyzing PA Oakley's opinion.

Plaintiff points out that the ALJ erroneously referred to Micah Oakley as "Dr. Oakley."   Oakley is a physician's assistant, and not a doctor.   However, it is difficult to see how this mistake could have prejudiced plaintiff.

As a physician's assistant, Mr. Oakley is not an "acceptable medical source." 20 C.F.R. §404.1513(a).   Therefore, his report does not constitute a "medical opinion."   See, 20 C.F.R. §404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .)"

Because PA Oakley is not an acceptable medical source, he is not

considered to be a treating source; his opinion is not considered to be a "medical opinion" and is not entitled to any special weight under §404.1527(c).   SSR 06-03p, 2006 WL 2329939, at *2.   This does not mean, however, that the ALJ may simply ignore the opinions of a medical source such as PA Oakley.   The ALJ is required to consider "all relevant evidence" and may, as appropriate, consider the factors set forth in §404.1527(c) in the process of weighing the opinions of nonacceptable medical sources.   SSR 06-3p, at * 4-5.

It is apparent that ALJ Supergan applied the §404.1527(c) factors in deciding how much weight to give to PA Oakley's opinion.   She noted that PA Oakley's opinion was inconsistent with the other medical evidence in the record, was not supported by his own clinical findings, and was based on plaintiff's subjective complaints.   See, Tr. 18.

Plaintiff takes issue with the ALJ's conclusion that PA Oakley's opinion was inconsistent with the rest of the medical evidence by pointing out that X-rays and MRI studies showed "significant abnormalities."   See. Doc. 14, p. 8.   However, he cannot point to any such study that was ignored or overlooked by the ALJ.   On the contrary, she acknowledged the results of the studies.   She also noted, correctly, that, despite the MRI findings, many of the physical exams showed minimal abnormal findings.   For example, although plaintiff had ongoing tenderness over the lumbar spinal musculature, straight leg raising was negative in April 2012.   A September 2012 exam at Trinity Neuroscience resulted in normal physical and neurological findings; he had normal gait, sensation, motor strength and

coordination.   And, despite the findings on the shoulder and neck MRI studies, in November 2012, Dr. Miller's exam showed normal range of motion of the shoulder with only mild tenderness, and Mr. Styles reported that he was functioning fairly well on pain medication and Flexeril.   See, Tr. 15-16.   These are accurate summaries of the doctors' findings.   Plaintiff's argument that the specialists' examinations provide objective support for PA Oakley's opinion is not supported by the record.

Plaintiff also takes issue with the ALJ's conclusion that PA Oakley's opinion is not supported by his own clinical findings.   His argument is based on a mistaken reading of the record.   Plaintiff argues that PA Oakley's examination on July 11, 2012, showed restricted motion of the shoulder.   See, Doc. 14, p. 10.   However, PA Oakley did not see Mr. Styles on July 11, 2012.   Plaintiff was seen on the date by APN Jill Cash.   (Tr. 533-534).   There is no indication in the record or in PA Oakley's report that he reviewed or relied upon the notes of any other practitioner in completing his report of July 26, 2012.

A careful review of the records of Logan Primary Care establishes that PA Oakley saw Mr. Styles for the first time on July 26, 2012, the same day on which he filled out the disability form.   The office notes for that date include only one abnormal finding: under "musculoskeletal," PA Oakley noted "pain with rom lss, ambulates with cane."   (Tr. 531).   There is no explanation of where the range of motion loss was detected, or the severity of the loss.   This single office note provides scant support for PA Oakley's opinion.

Page **16** of **22**

As support for his opinion about plaintiff's limitations in reaching, handling, fingering and feeling, PA Oakley wrote in his report, "pain [with] ROM UE's & LE's [upper and lower extremities] leads to increased imbalance & pain in back."   See, Tr. 392.   PA Oakley cited no clinical or medical findings specific to plaintiff's ability to use his hands for handling, fingering and feeling.   Therefore, this note provides no support for his opinion as to plaintiff's manipulative limitations.   And, while PA Oakley did observe that Mr. Styles used a cane on the date of his first exam, Mr. Styles does not claim that he needs to use a cane on an ongoing basis.   Later exams showed he had a normal gait, and he testified at the hearing that he no longer used a cane.   Further, PA Oakley's later exams showed generally normal findings.   See, Tr. 503-505, 521-523.

Lastly, plaintiff argues that the ALJ had no basis for saying that PA Oakley's report was based on sympathy and on plaintiff's subjective complaints.   Here again, plaintiff incorrectly argues that PA Oakley saw plaintiff on July 11, 2012, when he did not.   Plaintiff also argues that PA Oakley's opinion was not based on subjective complaints because objective test such as X-rays and MRI studies showed abnormalities.   This argument misses the mark.   PA Oakley did not say in his report that he relied on the results of any such studies, and, moreover, some of the studies had not yet been performed on the date of PA Oakley's report.   As PA Oakley did not cite to any objective evidence beyond his vague reference to pain with range of motion, the ALJ was entitled to conclude that he relied on plaintiff's subjective complaints.   Further, PA Oakley explicitly stated that he relied on

plaintiff's subjective statement regarding his lifting restrictions.   He wrote that plaintiff could only pick up his grandkids for about 30 seconds and then has to put them down because of pain radiating down his right leg.   (Tr. 390).   An ALJ may reject an opinion that is based on a claimant's subjective complaints.   *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).   Since PA Oakley relied on plaintiff's subjective complaints in assessing very restrictive limitations, it is not erroneous to describe his opinion as "sympathetic."

It is clear that the ALJ considered the §1527(c) factors in assessing PA Oakley's opinion.   Plaintiff has not demonstrated that the ALJ erred in his consideration.   His first point is denied.

Plaintiff's next attacks the ALJ's credibility analysis.

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding.   *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).   The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong."   *Ibid*.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the

Page **18** of **22**

claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3.  While plaintiff's claims cannot be rejected solely because they are not supported by objective evidence, 20 C.F.R. §404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration."  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Here, ALJ Supergan gave a number of reasons for her adverse credibility finding.  She pointed out that the medical records do not support plaintiff's claim that he is totally disabled.   For instance, although he claimed to have cramping in both hands and said he could not grab anything with his left hand, physical exams consistently showed normal neurological exam, reflexes, sensation and coordination, and he never reported these symptoms to his healthcare providers. She also noted that his daily activities contradicted his testimony.   He rolled his own cigarettes, gathered eggs and used a cellphone, which undermined his claims as to his manipulative limitations.   She noted contradictions in his various statements.   She also noted that he played some role in his wife's business, and that he admitted at the hearing that he used marihuana but denied drug use to his healthcare providers.   He was unable to explain the doctor's note that said he contracted poison ivy while out in the woods with his son.   See, Tr. 17.   She also noted, albeit in a different section of her decision, that the results of the February

2013 drug test contradicted his statements to his healthcare provider.   See, Tr. 13.

Ignoring most of the ALJ's reasons, plaintiff advances only two specific criticisms of the ALJ's credibility analysis.   He argues that the ALJ cherry-picked the medical evidence in concluding that the evidence did not support his claim of total disability.   However, he points to no specific evidence that was ignored by the ALJ.   He again cites to the X-ray and MRI results, but those results were acknowledged by the ALJ and those studies do not, in themselves, establish that plaintiff is disabled.   Further, while she acknowledged that plaintiff had abnormal findings on some exams, such as positive straight leg raising and limited range of motion, she correctly pointed out that he had normal findings on other exams. Plaintiff accuses the ALJ of cherry-picking the medical evidence, but his own argument is based on cherry-picking in that he fails to acknowledge the many exams that resulted in mild or completely benign findings.

Plaintiff also argues that the ALJ erroneously equated his limited daily activities with an ability to work full-time.   It is true that the Seventh Circuit has cautioned ALJs about equating ability to engage in some daily activities with an ability to work full-time because daily activities allow for flexible scheduling and assistance from others, and do not require a minimum standard of performance. See, *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014), and cases cited therein. Here, however, the ALJ did not equate Mr. Styles' daily activities with an ability to work full-time.   Rather, she correctly noted that his ability to engage in some specific activities contradicted his allegations as to the extent of his limitations.

An ALJ is required to consider, among other factors, a claimant's daily activities in determining whether he is disabled.   20 C.F.R. §404.1529(a), SSR 96-7p, at *3.   While it may be error to equate limited daily activities with the ability to work full-time, it is not error to consider daily activities; in fact, is proper for an ALJ to consider a conflict between the plaintiff's claims about what he can do and the evidence as to his activities.   See, *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013).

In sum, none of plaintiff's arguments are persuasive.   His arguments are nothing more than an invitation to the Court to reweigh the evidence.   Even if reasonable minds could differ as to whether Mr. Styles was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).   ALJ Supergan's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Supergan committed no errors of law, and that her findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying George Styles' application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   January 8, 2016.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**